COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Alston and Senior Judge Coleman


ARTHUR BARNETT

v.      Record No. 2400-11-2

RICHMOND DEPARTMENT OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
ARTHUR BARNETT                                                   JUNE 12, 2012

v.      Record No. 2401-11-2

RICHMOND DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

(Robert D. Shrader, Jr.; Steingold and Shrader, PLC, on brief), for
appellant.

(Shunda T. Giles, Senior Assistant City Attorney; Marc Yeaker,
Guardian *ad litem* for the minor children, on brief), for appellee.


The trial court terminated the residual parental rights of Arthur Barnett, father, to his

children, M.B. and A.B., pursuant to Code § 16.1-283(C)(2) and approved foster care plans with a

goal of adoption. On appeal of these decisions, father challenges the sufficiency of the evidence to

support the terminations. Upon reviewing the record and briefs of the parties, we conclude these

appeals are without merit. Accordingly, we summarily affirm the decisions of the trial court. See

Rule 5A:27.

On appeal, we view the evidence in the "'light most favorable' to the prevailing party in the

circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005) (quoting Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). When reviewing a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Id. at 265-66, 616 S.E.2d at 769 (quoting Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted)). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

M.B. was born on August 8, 2005, and A.B. was born on June 11, 2008. The Richmond Department of Social Services (RDSS) became involved with the family when M.B. was born addicted to heroin. RDSS offered services to the family to stabilize the children in the home.[1] From 2005 to 2008, they provided services including substance abuse treatment, anger management, couples counseling, housing services, and a parental assessment. M.B. was removed from the home on July 21, 2006 due to ongoing domestic violence in the home. He was returned to the home in March of 2008, and RDSS continued to provide services to the family.

A.B. was born exposed to methadone. Deborah Gudger, a foster care social worker, began to work with the family on November 1, 2008. From 2008 to 2010, RDSS provided reunification services and stabilization services to the family. Kareema Barnett, the mother of the children, had

---

[1] Two other children resided in the family home who are not father's biological children and are not the subject of these appeals.

- 2 -

recurring substance abuse issues. Gudger repeatedly spoke with father about the importance of participating in the in-home services via Specialized Youth Services, but he did not follow through with the appointments.

From April 1, 2010 to May 7, 2010, RDSS could not locate the family who had moved and not informed RDSS of their new address. On May 7, 2010, father reported to RDSS incidents of substance abuse and domestic violence in the home. On May 8, 2010, father and mother had a physical altercation during which mother bit father. Also on that date, a child in the home (that child is not the subject of this proceeding) obtained a knife and cut his mother during the fight. The child told a RDSS worker that father told him to get the knife because mother had father "pinned down" and she was choking father. Father obtained a temporary protective order against mother.

In May 2010, the Child Protective Services Hotline received a complaint that father knowingly left the children alone with their intoxicated mother. Gudger visited the school of M.B., and she reported M.B. had an increase in enuresis at school and he displayed aggressive and deviant behaviors toward his peers. The school recommended a psychological evaluation of M.B. because of an incident involving a knife and because the five-year-old child had exhibited other self-injurious behaviors. Father failed to follow through with the evaluation, and he failed to take M.B. to any scheduled appointments at Children's Hospital.

At almost 10:00 p.m. on May 12, 2010, employees of RDSS attempted to conduct a child welfare check at the home and no one answered the door. Also in May 2010, the juvenile and domestic relations district court entered an order transferring custody of M.B. to RDSS based on a finding that he was abused and neglected. Father, mother, and the children fled to Hopewell, Virginia and failed to appear at the subsequent preliminary removal hearing. Later that month, M.B. was removed from the home and placed in foster care. M.B. has been diagnosed with

post-traumatic stress disorder and mood disorder, and he has exhibited several high-risk and harmful behaviors. These behaviors have decreased over the time he has been in foster care.

A.B. was almost two years old when she went into foster care. She initially exhibited "aggressive" actions and some sexually inappropriate behaviors. She was also non-verbal. However, over time, she has become less aggressive and more verbal. A.B. has bonded with her foster family and, for the most part, interacts appropriately with her peers.

Initially, the foster care plan had concurrent goals of return to home and placement with relatives. The goal of return to home could have been achieved if father completed all of the service referrals. Father completed the parental assessment and anger management classes. At the time of the trial court hearing, his substance abuse treatment was "ongoing" and he had started a domestic violence course. Father was also incarcerated from about July 15, 2010 to mid-November 2010 for the forgery of public records and driving under the influence.

By December 2010, because father had not fully cooperated with services, a new foster care plan was filed with the goal of adoption. RDSS also filed petitions to terminate father's parental rights. Gudger testified father's "behaviors do not demonstrate that he had fully comprehended, understood the skills that were being offered to him" to provide for the safety of his children. She stated he had not demonstrated he could protect his children and ensure their needs were met.

Although father completed anger management classes in May 2011, the police reported to the family's residence in June 2011 for a domestic disturbance call. Father and mother had engaged in a physical altercation, father's head was bleeding, and mother accused father of choking her and punching her in the mouth. Mother was arrested for aggravated assault and drug possession.

Laurel Purchase, the owner of the Behavioral Awareness Center and a licensed clinical social worker, worked with father in 2006 and in 2011. In 2011, she performed a parental assessment on father. She stated father had active addictions during the marriage to mother and he

and mother enabled each other. Purchase stated father believes he is a good parent and he blames mother for all of the problems they have had in the past and in the present. At the time of the hearing, father and mother resided at the residence of father's father.

Purchase testified she was "struck by the similarities" between father's current situation and his situation when the children were first removed in 2006. In 2006, father had alcohol abuse issues and received treatment for that condition. Four years later, he was again in substance abuse treatment. Father completed anger management and parenting classes in 2006. In 2011, he was ordered to complete parenting and domestic violence classes. After the 2006 removal, the children were returned home to the parents and received in-home services, but they were again removed. Purchase testified "[t]he one clear factor is that drugs and alcohol are a constant theme [in the family home] combined with fighting." Purchase testified that father does not believe he is responsible for the children being removed from the home and until he accepts responsibility for not keeping the children safe, "nothing will change." She stated, "Since the situation had not changed in the past four years, it is unlikely to change in the future." Purchase did not recommend any additional services be put in place for the family.

The guardian *ad litem* for the children opined that it is in the best interests of the children that father's parental rights be terminated, stating that the children's issues are improving while in foster care. The guardian *ad litem* also noted that despite the years of RDSS's involvement with the family, the family was "just stuck" and continued to have the same concerns they previously addressed.

The trial court terminated father's parental rights to M.B. and A.B. and approved the goal of adoption for the children. Father appeals those decisions.

Pursuant to Code § 16.1-283(C)(2), a parent's residual parental rights "of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child" and that

> [t]he parent . . ., without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

In determining what is in the best interests of a child, this Court has stated:

> a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

The evidence showed that, despite the efforts of RDSS, father had been unwilling or unable to remedy substantially the conditions that led to and required the continuation of the children's foster care placement. By the time of the trial court hearing, the children had been in foster care for sixteen months. The older child had also been in foster care from July 2006 to March 2008. In addition, RDSS had worked with the family since 2005. Father previously completed parenting, anger management, substance abuse, and counseling services, yet in 2010, he was ordered to repeat many of these same services. Even after father completed many of the services for a second time, there were continued issues of domestic violence and substance abuse in the family home. In addition, the children exhibited disturbing and aggressive behaviors. However, their behavior and emotional well-being has improved since they have been in foster care. Moreover, father did not accept any responsibility for the children being removed from the home. A social worker testified

- 6 -

that she would not recommend any further services for father, stating that the family situation was unlikely to change in the future as it had remained unchanged since 2006, despite the efforts of RDSS.

"'[P]ast actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" Winfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997) (quoting Linkous v. Kingery, 10 Va. App. 45, 46, 390 S.E.2d 188, 194 (1990)). In addition, decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services.

Toms, 46 Va. App. at 271, 616 S.E.2d at 772.

We recognize that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Based upon the foregoing, the trial court did not err in changing the goals to adoption, finding termination was in the best interests of the children, and terminating father's parental rights pursuant to Code § 16.1-283(C)(2). Accordingly, the trial court's decisions are affirmed.

Affirmed.